DeWITT C. BLAIR, individually and as executor of John I. Blair, deceased,

*v.*

CHARLES SCRIBNER et al.

[Filed January 30th, 1904.]

1. Testator bequeathed to a trustee a specified number of shares of stock in named corporations for each of a number of beneficiaries. At the time the will was made testator owned sufficient of each of the stocks described to satisfy the bequests, but at his death did not. Another clause provided that if testator should not leave all the stock mentioned and given in trust, the trustee, who was also executor and residuary legatee, should not be required to supply them, but only take such as testator left.—*Held*, that the trustee could not take from the estate stocks, other than those mentioned, to supply the deficiency in the stocks specifi-

Blair *v.* Scribner.

cally described, but that the bequests failed in so far as they could not be satisfied by stocks of the required kind owned by testator when he died.

2. Testator bequeathed to a trustee, who was also executor and residuary legatee, certain sums, "in bonds" of specified corporations, to be taken at their face value. At the time the will was made testator owned enough of each kind of bonds described to satisfy all the legacies, but at his death did not. A further clause provided that if testator should not leave all the bonds mentioned, the trustee should not be required to supply them, but only take such as testator left.—*Held,* that the legacies were specific and failed because of the want of the designated bonds to satisfy them.

3. Evidence as to the circumstances of a testator's acquisition of certain stocks and bonds bequeathed by the will, his subsequent disposal of them and as to his habits and methods of business, is admissible for the purpose of applying the terms of the will.

4. Such evidence is, however, not admissible to show testator's intention as to bequests, or to aid in the construction of the will.

Heard on bill, answer, replication and proofs.

This is a bill filed by an executor for the construction of the will of the testator, John I. Blair, and for directions as to the disposition under the will of the personal estate in hand for distribution. Complainant is the sole executor of the will and the sole trustee, to whom six of the bequests now in question were made, and is also the sole surviving child of the testator and his residuary legatee, and the bill is filed by him individually as well as in his capacity as executor and trustee. Several questions are raised for direction by the court. The first and principal question is, what bonds or stocks, which are now in the possession of the complainant as executor, should be delivered to him, or should he take as trustee under six trusts separately declared for the defendants. Under these trusts there were bequeathed to the trustee legacies of sums of money amounting to $995,000 in the aggregate, in bonds of corporations, to be taken at their face value, and legacies of shares of stock in corporations amounting in the aggregate to twenty-four thousand nine hundred and forty shares. At the time of making his will, March 5th, 1878, the testator owned bonds and stocks of the description referred to in the will, and owned more than sufficient of each kind of stock and bonds to answer the description in the

will. The testator was then about seventy-six years of age and lived until December 2d, 1895. Between the date of the execution of the will and his death the testator had himself sold all of the bonds of six companies owned at the date of the will, including bonds to the amount of $433,000, mentioned in the trusts. Between these dates, also, all of the bonds of eight of the companies matured and were paid to the testator, including bonds to the amount of $101,000, named in the trusts. Bonds of two others of the companies, which testator owned at the date of the will, were afterwards exchanged by him for other securities, including bonds to the amount of $287,000, named in the trusts. By reason of these sales, payments and exchanges, the only bonds answering the description named in the trust bequests which remained or were in the testator's estate at his decease were the bonds of three corporations, and of these bonds the testator left more than sufficient to answer the amounts of legacies in these bonds, which was $134,000. Of this $134,000, $120,000 is in bonds of the Cedar Rapids and Missouri River railroad, and by the will legacies of $120,000 in these bonds are given to three of the trusts only, viz., the trusts called the Arthur Scribner, Isabella Scribner and the Clarence Mitchell trusts—$40,000 to each. Nine thousand is in bonds of the Sussex Railroad Company and five thousand in Washington county bonds, and these bonds are given to five only of the six trusts, the John Blair Scribner trust being omitted. As to bonds of the precise character specified in the trusts, the situation therefore of the testator's estate at the time of his death was that there were no bonds of the kind described in the John Blair Scribner trust of $56,000 in bonds, par value; there were bonds to answer $2,000 of the $149,000 of bonds, par value, given to the Emma Scribner Larned trust, bonds to answer $3,000 of the $150,000 of the Charles Scribner trust, and bonds to answer $43,000 in each of the $200,000 trusts for Arthur Scribner, Isabella Scribner and Clarence Mitchell. In relation to the legacies of specified sums of money "in bonds," the question raised is whether these legacies are lost or fail to take effect, except to the extent to which bonds answering the description of the bonds in the trust declared in

the will remain in the estate. The situation of the testator's estate at the time of his death, in relation to the possession of the stocks specified or described in the six trust legacies, is similar. The testator gave to his son as trustee for each one of five of the six trusts forty-one hundred and ninety shares in the stock of twenty-five different companies, and for the other trust thirty-nine hundred and ninety shares in the same companies, the only difference being that the shares of two of the railroad companies given for this latter trust were fifty shares each instead of one hundred and fifty shares, as in the case of the five other trusts. This trust, in which the smaller number of shares was given, was the John Blair Scribner trust, for which the sum of money given in cash to John Blair Scribner and in bonds to the trustee was $6,000 in excess of the amount given in the other five trusts. The excess in shares of the five trusts was $20,000 par value, but the real or market value of the shares at the date of the will does not appear, nor does it appear whether they were then worth $6,000. In other respects the gifts of stock for the purposes of the trust were precisely similar and for each trust similar amounts of each stock were designated. At the execution of his will these shares of stock in each of these twenty-five companies mentioned in the trust constituted only a portion of the stock in each of them held by the testator, but before his death he had sold all of his stock (sixty-one hundred and thirty shares) in seven of the companies; in five other companies shares to the extent of seventy-three hundred and eighty-two shares had been redeemed by the companies, and shares in five other companies to the extent of eighty-seven hundred and eighty-six shares had been exchanged by the testator for stock in other companies. There were in the estate at the time of testator's death twenty-one hundred and sixty shares in six of the companies to an amount sufficient to meet the trusts, three hundred and sixty shares in each trust; six hundred and sixty-nine shares in three other companies, but not sufficient for the purposes of the trusts, which required sixty-four hundred and forty shares, and shares of one company sufficient to meet the trust, but which is worthless. As to the

other company, the Blairstown Railroad Company, of which six hundred shares were bequeathed to the trustee (one hundred for each of the trusts), the testator, although at the time of the will entitled to stock for more than that amount, seems never to have taken out certificates of stock and subsequently the stock of the company with which it was consolidated was issued in exchange. In reference to the legacies of stock to the trustee, the question also arises whether these have also failed to the extent that the shares were not in testator's estate at the time of his death. That the testator had expressly in mind, at the execution of his will, the contingency that all of the bonds and stocks specified in the trust might not be left in his estate at his death appears by the following clause of his will, which occurs in the clause giving powers and direction to the executor:

"And it is my further meaning that if I should not leave at my decease all of the bonds or stocks mentioned in my said will and given to my said son DeWitt Clinton Blair in trust he shall not be required to supply said bonds and stocks but only take such as I may leave."   .

In reference to the legacies in question the complainant claims (1) that the gifts both of bonds and of stocks are specific, and that irrespective of this "further meaning" clause they are therefore adeemed or lost to the extent that they did not exist *in specie* in testator's estate at the time of his death, and (2) that by this "further meaning" clause the testator expressly contemplated ademption of these specific legacies of bonds and stocks, and that, for the purposes of the trusts, the testator intended that the trustee should take "only such [of the said stocks and bonds], as I may leave." On the other hand, it is claimed on behalf of the grandchildren, that as to the bonds, the gifts of legacies are not specific, but are demonstrative, *i. e.,* are legacies of sums of money, the bonds being mentioned only as demonstrating the primary source of payment of the sums of money; that these primary sources having failed, the legacies in bonds, independent of the "further meaning" clause, would be payable in money out of the general estate to the extent that the primary source of payment has failed. As to the stocks, they claim that the legacies are

general and not specific, and, as originally given, are equivalent to legacies of the amounts of money necessary to purchase the stocks. As to the effect of the "further meaning" clause upon the legacies, they claim that by the direction that in case all of the bonds and stocks were not left by the testator, then the trustee. should "only take such as I may leave," the testator meant "such bonds and stocks [of any kind] as I may leave," and did not mean such of the bonds and stocks (specified in the trusts) as testator might leave. Upon this construction. of this clause it is claimed that the trusts are to be filled up, both as to bonds and stocks, from the bonds and stocks left by the testator, and several methods of so filling up the trusts have been suggested in the answer or at the hearing. Upon both sides the question as to the character of the legacies, independent of the "further meaning" clause and the general character and scope of the will and of the trusts, have been referred to as throwing light upon the construction of this clause, and as, in my opinion, the construction of this clause does, or may to some extent, depend upon the *status* of the legacies, independent of it, a reference to all the portions of the will which appear to have any bearing upon the character of the legacies in question should be made.

The will of the testator, in its *first* paragraph, directs that his executor shall not be required to file any inventory of the estate, and after the *second* paragraph, in which a life estate in the mansion-house and an annuity of $6,000 is given to his wife, the testator proceeds, in eighteen paragraphs, numbered *third* to *twenty,* to establish trusts and give legacies, amounting in the aggregate to $130,000 (estimating both the bonds and stocks bequeathed in these paragraphs at their par value). At this time testator's entire estate in bonds amounted (at par value) to $2,435,057.50, and in stocks (par value) $5,271,330, not including the Blairstown Railway Company stock, to which he was then entitled. These bonds and stocks constituted the bulk of his estate, the remainder of it consisting of about $196,000 in notes and judgments, $13,200 in bonds and $78,500 estimated value of his real estate, altogether $287,164.02. This amount also excludes an asset of $162,250 for money paid in

and expended on the Blairstown railway, for which he was entitled to receive stock. His outstanding obligations at the time of the will were $254,603.06. The legacies given in the first twenty paragraphs of the will were in every instance (except two) legacies of bonds in companies or of specified amounts in bonds, or of shares of stock in companies, or of the interest on such bonds or shares. The exceptions were paragraph *seven,* directing payment of a mortgage held against John H. Blair, and paragraph *twenty,* bequeathing a mortgage of $10,000 to his son-in-law, Walter C. Larned. None of these legacies were simple pecuniary or money legacies, bequeathing money or amounts of money without other words, but all the legacies in which amounts of money were named were gifts of specified amounts of money "in bonds" of companies specified "to be taken at their par value," and in each case to be delivered to the legatee (other than the executor) by the executor within one year after testator's decease. These gifts in bonds (to others than the executor) are (paragraph 10) $3,000 in bonds of two companies to Emma E. Vail, (paragraph 11) $10,000 in bonds of two companies to John D. Vail, (paragraph 12) $15,000 in bonds of three companies to the trustees of the Blairstown academy, (paragraph 13) $7,000 in bonds of three companies to Charles E. Vail, in trust; (paragraph 14) $5,000 in bonds of three companies to the Oxford church, in trust, and (paragraph 15) $1,000 in bonds of two companies to Charles E. Vail, in trust. In this last gift the direction to the executor to deliver the bonds, which appears in all the other legacies of money in bonds, does not appear. The legacies of stock, in paragraphs three to twenty, are in the form: "I give and bequeath to A. B. ———— shares of the stock of the ———— Co. to be transferred to him (or her) by my executor within one year after my decease." These bequests of stock to others than the executor occur in paragraph 10, to Emma E. Vail, seventy shares; paragraph 11, to John D. Vail, four hundred and fifty shares; paragraph 13, to Charles E. Vail, in trust, thirty shares; paragraph 17, ten shares to Mrs. Titman; paragraph 18, ten shares to Mrs. Winter, and paragraph 19, ten shares to Mrs. Boyes.

These bequests, which may be called the minor or prelimi-

nary bequests, amount in the aggregate to $55,000 of legacies
of bonds, or "in bonds," and six hundred and twenty shares in
stock.

After these minor dispositions of his property the testator,
by a series of "items" following paragraph "twenty" of the will,
disposes of his entire estate. By the *first* of these "items,"
after devising to his nephew, Charles E. Vail, in fee, the man-
sion-house, subject to his wife's life estate, and other real estate
in New Jersey, he gives to this nephew $50,000 (in the aggre-
gate) in bonds of twenty-one different companies, "the said
bonds all to be taken at their face value and to be delivered to
the said Charles E. Vail by my executor within one year after
my decease." The precise form of the bequest of bonds is:

> "I also give and bequeath unto the said Charles E. Vail five thousand
> dollars in bonds of the Cedar Rapids & Missouri River Railroad Com-
> pany, five thousand dollars in the bonds of the Iowa Falls & Sioux City
> Railroad Company," &c.

Shares in the stock of twenty-five companies, aggregating in
number sixteen hundred and forty shares, are then bequeathed
to Charles E. Vail by a separate and distinct bequest; the form
of this bequest being in its introduction:

> "I also give and bequeath unto the said Charles E. Vail fifty shares
> of the Chicago, Iowa & Nebraska Company's stock; one hundred shares
> of the Cedar · Rapids & Missouri River Railroad Company's capital
> stock," &c.

There is no special direction in this item that the executor
should transfer the stock. After this item follow in succession
the six "items" in question, three of which contain separate,
direct bequests to three of the testator's grandchildren, and all
of which contain the separate bequests to DeWitt Clinton Blair,
the son of the testator, as trustee for each of the six grand-
children of the testator then living and their respective chil-
dren. These grandchildren were John Blair Scribner (since
deceased) and the defendants, Charles Scribner, Arthur Scrib-
ner, Emma Scribner Larned and Isabella Scribner (since mar-
ried), the five children, then all living, of Emma Elizabeth

Scribner, a daughter of testator, who had died in his lifetime, and a grandchild, Clarence B. Mitchell, the only child of Amelia A. Blair, another daughter of testator who had predeceased him. DeWitt C. Blair, the complainant, was the only one of the three children of testator who was living at the date of the will. John Blair Scribner, one of the grandchildren, died in 1879, after the date of the will, without issue, and the share or legacy given in trust for him for life goes over to his surviving brothers and sisters. The testator, before the execution of his will, had loaned or made advancements to two of the Scribner children, viz., to John Blair Scribner, $150,000; to Emma Scribner Larned, $51,000; and he also, in the *item* establishing the Charles Scribner trust, gives to Charles Scribner $50,000, to be paid to him within a year after testator's decease, unless this is advanced to Charles during testator's life. For each of the trusts of the other three grandchildren (Arthur Scribner, Isabella Scribner and Clarence Mitchell) there is given to the trustee legacies "in bonds," to be taken at par value, aggregating exactly $200,000 to each trust. For the Charles Scribner trust is given legacies in bonds, aggregating (par value) $150,000; for the Mrs. Larned trust, $149,000 (par value), and for the John Blair Scribner trust, $56,000 (par value). The trusts for the benefit of each grandchild and his issue, in money or in bonds, were thus apparently equalized at $200,000 by deducting from the amount of $200,000 given in bonds the amount previously loaned or advanced, or given by the will to a grandchild out and out. The only trust which received more than $200,000 (counting bonds at par value as equal to cash) was the John Blair Scribner trust, which received an aggregate of $56,000 in bonds and cash of $206,000, but in the legacies of stock the John Blair Scribner trust received two hundred shares of stock less than any of the others. The total legacies "in bonds" in these six trusts amounted to $955,000, and the whole amount in bonds (par value) then owned by the testator, answering the description of the bonds in the will, was $2,435,057.50. As to the legacies of shares of stock there was separately given to the trustee for the benefit of each one of five of the trusts, forty-one hundred and ninety shares of

Blair *v.* Scribner.

stock, and to the John Blair Scribner trust thirty-one hundred and ninety shares, two hundred shares less, the difference being that the latter trust received only fifty shares in each of two companies instead of one hundred and fifty shares, being the amount given for the benefit of the other trusts. Otherwise the gifts of stock for each trust were precisely similar, and to each trust was given the same number of shares in each company, and to each trust was given shares in every company in which testator owned stock at the date of his will, except stock of four companies, viz., two fire insurance companies, in one of which he owned eighty-five shares, par value $5 per share, $425, and in another fifteen shares, par value $375; the Cayuga and Susquehanna Railroad Company, sixty-one shares, par value $1,830; the Crown Point Iron Company, one hundred and eighty-seven shares, par value $18,700. In reference to the legacies of sums of money in bonds, it should also be noted that the bonds are divided among the different trusts on the same general plan of a distribution of the different bonds between the several trusts equally. This will appear by a tabulation of the distribution, which shows that all of the six trusts have bonds of eight companies; that the five trusts, other than the John Blair Scribner trust, then have in addition the same number of bonds in ten other companies, and that the three trusts which have $200,000 in bonds, the Arthur Scribner, Isabella Scribner and Clarence Mitchell trusts, have bonds of the same amount ($75,000) in three additional companies. While the bequest to the trustee of money in bonds and of stocks are of the same character in each of the six trusts, the trusts themselves are not altogether similar. The bequest in the first trust, the John Blair Scribner trust, will sufficiently show the general form. This "item" begins with the direct bequest to this grandson as follows:

"To my grandson J. Blair Scribner I give and bequeath the sum of one hundred and fifty thousand dollars which I have already lent to him & for which I hold his notes and obligations, and I direct my executor to deliver up to the said J. Blair Scribner or to his legal representatives all notes & obligations which I may hold against the said J. Blair Scribner representing the foregoing sum of one hundred and fifty thousand dollars."

Then follows the J. Blair Scribner trust bequests:

"I give and bequeath unto my son, DeWitt Clinton Blair, twenty five thousand dollars in the bonds of the Sioux City & Pacific Railroad Company, seven thousand dollars in the bonds of the Green Bay & Lake Pepin second mortgage bonds,"

and in like words giving $24,000 more "in bonds" or "in the bonds" of six different companies, the total of this gift in bonds being $56,000. This clause then follows the gift, "the said bonds to be taken at their face value." As to the stocks, the language is:

"I also give and bequeath unto my said son DeWitt C. Blair fifty shares of the capital stock of the Chicago, Iowa and Nebraska Railroad Company, one thousand shares of the capital stock of the Cedar Rapids & Missouri River Railroad Company," &c.,

giving in the same language thirty-nine hundred and ninety shares (in the aggregate) in twenty-five companies, each company being separately named. These gifts to the trustee are

"*in trust* that he will hold the said bonds and stocks or such other as he may take in place thereof, and pay the interest arising therefrom in semi-annual payments to my grandson John Blair Scribner during his life, and after his death to his children, until the youngest child shall arrive at the age of twenty one years, and then to divide the said bonds and stocks or any substituted in the place thereof, or the moneys arising from the sale thereof, between his children, and if he dies without issue, then to divide the said bonds and stocks, or the substituted securities thereof, or the moneys arising from the sale thereof, between his brothers and sisters,"

the children representing parents under this clause. Next follows the "item" giving the bequest and declaring the trusts for Emma Scribner Larned, a granddaughter of testator, as follows:

"I give and bequeath to my granddaughter Emma Scribner Larned, now the wife of Walter C. Larned of Chicago, the sum of fifty one thousand dollars, money which I have advanced to her to build and furnish the house in which she now resides in Chicago and I direct my executor to deliver up to her all securities or evidences of debt I may hold against her for that sum of money."

Then follows the gift and bequest to the son of testator of $149,000 (in the aggregate) "in bonds" of the six companies mentioned in the previous trust and of twelve other companies, the first bequest being "twenty-five thousand dollars in bonds of the Sioux City and Pacific Railroad Company," and the legacies for different sums following the same form, the clause being added at the end of the gift of the bonds, "the said bonds all to be taken at their face value." Then follows, in this Emma Scribner Larned "item," the gift to testator's son of shares of stock, forty-one hundred and ninety in the aggregate, in the same twenty-five companies mentioned in the John Blair Scribner trust and in similar language. These gifts are in trust for Emma Scribner Larned during her life, and her children after death, and the language of the trust, *mutatis mutandis,* is the same as in the J. Blair Scribner trust. The third "item" contains the Charles Scribner bequest and trusts, opening as follows:

"I give and bequeath to my grandson Charles Scribner fifty thousand dollars to be paid to him by my executor within          year after my death unless I shall advance him that sum during my lifetime and take his notes thereof in which case I direct my executor to deliver over to him notes or obligations I may hold against him to that amount."

The testator then gives to his son, DeWitt Clinton Blair, as trustee, in the same language as in the previous trusts, $150,000 in the bonds of the same companies as are mentioned in the *Larned* trust, "said bonds are to be taken at their face value," and also forty-one hundred and ninety shares of stock in different companies, the amounts in each company being the same as in the Larned trust. The trusts upon which these gifts are made are also similar to the John Blair Scribner and Mrs. Larned trusts. To the trustee there is then given in the three following items the legacies for the purposes of each of the other three trusts—the Arthur Scribner, Isabella Scribner and Clarence Mitchell trusts. These three grandchildren were (as appears by the will) infants at the time of the execution of the will and no direct gifts or bequests were made to either of them, but in each of these trusts a larger aggregate sum

in bonds ($200,000) was given to the trustee. This aggregate sum to each of these trusts was given in twenty-one different kinds of bonds of nineteen different companies, the amount of the legacy in each kind of bonds being the same for each trust. For each there is also given to the trustee forty-one hundred and ninety shares of stock of the same number and character as in the Charles Scribner and Mrs. Larned trusts. The language of the bequest to the trustee in these three items, both as to the legacies in bonds and the legacies of stock, is precisely the same as in the previous trusts, "the bonds to be taken at their face value." The first trust upon which each of these three shares is to be held does not appear in the previous trusts, and the language of this trust is relied on as bearing upon the question whether the gifts of bonds are specific. The legacies in the Arthur Scribner trust are given to the trustee

"*in trust* nevertheless that he will when the said Arthur H. Scribner shall arrive at the age of 21 years deliver to him $50,000 in any of the bonds above specified which the said Arthur H. Scribner may choose to take said bonds to be taken at their face value or if the said Arthur shall prefer to have the money, that then the trustee shall sell and dispose of Fifty thousand dollars of the most valuable of the said bonds in this item specified in his judgment and pay the proceeds of such sale to the said Arthur H. Scribner, and in further trust to pay the interest arising from the balance of said bonds and the said stock in semi-annual payments to said Arthur during his life,"

and then upon the same trusts, *mutatis mutandis,* as the previous trusts.

The legacies in the Isabella Scribner trust are upon the same trusts and in the same language (*mutatis mutandis*) as the Arthur Scribner trust above set out, including her choice to select bonds or receive $50,000, except that this choice is to be made by her when she shall arrive at the age of twenty-one years, and until she reaches that age, the trustee is

"to pay so much of the interest or income arising from the balance of said bonds and the said stocks in semi-annual payments to her, as may be necessary for her support and maintenance and education, until she shall arrive at the age of 21 years."

In the Clarence Mitchell trust the trusts, as to the payment of the income to him for support, maintenance and education until he reaches twenty-one, the selection by him, at twenty-one, of $50,000 in bonds or money, and the payment of the income of the bonds and stock for life, and the division of bonds and stock among his children at his death, are the same as the Arthur and Isabella Scribner trusts, but the bequest over in case of Clarence Mitchell's death without issue surviving, or if he should die before reaching twenty-one, was

"that the share which I have above given to him should go to and vest in testator's grandchildren, the Scribners, or their legal representatives, in the same manner as they were to have their own shares."

And as to the Isabella Scribner and Clarence Mitchell trusts the testator further declares:

"My meaning is that the said Isabella Scribner and Clarence B. Mitchell shall have all the interest after they arrive at the age of twenty one years which may have accumulated at any time after said bonds and stocks may come to the hands of my trustee."

Having made the devises and bequests in the twenty paragraphs and seven "items" above referred to, the testator makes no further or other special gift or devises, and the clause giving or defining the powers of the trustee or executor next follows. The portions of this clause which have or may have a bearing in this case are as follows:

"I authorize and empower my said Trustee DeWitt Clinton Blair in all matters in which he is in and by my said will appointed trustee to sell and dispose of any bonds & stocks or other property which I have given and bequeathed to him as such trustee, and to invest and reinvest the proceeds of such sale as often as he may think proper in such securities as he may in his judgment deem best for the interest of those for whom he is appointed trustee. * * *"

"And it is my further meaning that if I should not leave at my decease all of the bonds or stocks mentioned in my said will and given to my son DeWitt Clinton Blair in trust, he shall not be required to supply said bonds and stocks, but only take such as I may leave and my further meaning is that he is only to pay such interest and income from the securities in his hands as trustee as he may receive, and is not to be held accountable if such securities should yield no income. * * *"

"I direct my executor to pay all my debts that I may leave out of the income of the stocks and bonds which I shall leave and I direct my said executor and my said Trustee not to pay any interest to any of the persons named in my will except to my wife, until all my just debts are paid from the income of the said stock and bonds which I shall leave, anything hereinbefore provided to the contrary notwithstanding, and I further direct my said executor not to transfer any stocks or bonds to any trustee herein named or to any other person or persons except the said Anna Blair, until he shall from the income of my said stocks & bonds pay all my just debts."

There is a further direction that whatever accumulation of interest may be due to Isabella Scribner or Clarence Mitchell, in the hands of the trustee on their respectively arriving at age, may be paid by passing over the securities in which it is invested, or the money, at the trustee's option.

The residuary clause then follows, giving all the residue of testator's estate, real or personal, to his son, DeWitt Clinton Blair, with the further direction,

"that if any of the bequests, legacies or trusts which I have hereinbefore made should fail or lapse, that such bequests shall be considered as a part of my residuary estate and shall go to the said DeWitt Clinton Blair."

*Mr. George M. Shipman, Mr. John W. Griggs* and *Mr. Hornblower* and *Mr. Byrne* (of the New York bar), for the complainant.

*Mr. Richard V. Lindabury* and *Mr. Parsons* and *Mr. Crane* (of the New York bar), for the answering defendants.

EMERY, V. C. (after statement of facts and issues).

The legacies given to the trustee "in bonds" begin with a specification of an amount of money intended to be given "in bonds," and direct that the bonds are to be taken at their par value, while the legacies of stocks are simply gifts of a specified number of shares of stock, without reference to any amount of money or the face or other value of the stock. The questions as to the character of the legacies are therefore different in the two cases and the two classes of legacies are to be considered separately.

As to the legacies of stock, these are, under the authorities, clearly general legacies, if the clause of the will creating the gift be alone considered. A legacy of shares of stock, given generally and without any indication that testator intended to bequeath particular stock held by him at the date of the will, or existing as a part of his estate, is a general legacy, and if the shares bequeathed are not in testator's possession at the time of his death, the gift is considered to be a direction to the executors to purchase the securities for the legatee with his general estate. *Norris* v. *Thomson, 1 C. E. Gr. 218, 222 (Chancellor Green, 1863)*; 2 *Wms. Exrs. (R & T. ed.) \*1026; 3 Pom. Eq. Jur.* § *1132; 2 White & T. Lead. Cas. (4th Am. ed.) 610.* If the executors, having the power to purchase, fail to purchase, the legatee may then have in money the amount required to purchase the stocks. The legatee may, perhaps, have at once the option of receiving the money which was directed (constructively) to be laid out in stock, or of requiring the executor to purchase. But if the stocks cannot be purchased by the executor, because they no longer exist, and it is impossible to determine their value, the legacy fails. *In re Gray, 36 Ch. Div. 205 (1887).* If the legacies of stock in this case are general legacies, then the testator, by the subsequent provision that the executor shall not purchase the stock if it is not in his estate at his death, has, by express directions, prevented this legacy of this stock from operating or being equivalent to a direction to purchase, *i. e.*, to a general legacy of the amount of money necessary to purchase the stock. No sum of money is mentioned by the testator in connection with the legacy of stock, and as the shares bequeathed are not in the estate and the executor is directed not to purchase them, the legacies of stock, if they be considered general legacies under the clause creating the gift, cannot be considered as legacies of the value in money of the stocks bequeathed, either at the date of the will or at testator's death. But, in deciding whether a legacy of shares of stock is specific or general, the whole will must be considered and not merely the clause containing the gift or legacy. *Norris* v. *Thomson, 1 C. E. Gr. 542 (Errors and Appeals, 1863)*; 2 *White & T. Lead. Cas. (4th Am. ed.) 656,* and cases cited. On the face of this will there is a clear indica-

tion that the testator, in making the legacies of stock, was speci-
fying the stocks which he then owned.   The words with which
the "further meaning" clause opens, viz., "if I should not leave
at my decease all of the bonds or stocks mentioned in my said
will and given to my son in trust," show that the testator, in
the trust bequests, meant to give something then in existence and
which he owned, and that the bequests to the trustee were of
bonds and stocks, not of money legacies.   The second portion of
this clause, "he shall not be required to supply said bonds and
stocks," indicates also that the missing bonds and stocks, or
bonds and stocks not left by him, were, at the time of the will,
in existence and part of the property mentioned in the bequests.
A direction, that if testator should not have sufficient stock stand-
ing in his name to answer the legacies of stock previously given,
the executors should purchase sufficient to make up the de-
ficiency, is considered to show that the testator meant to give
something in existence at the time and that the legacies of stock
are specific.   Theob. Wills (4th ed.) 113, and cases cited;
Townsend v. Martin, 7 Hare (27 Eng. Ch.) 471; Queens Col-
lege v. Sulton, 12 Sim. (35 Eng. Ch.) 521.   Independent,
therefore, of the concluding words of this clause, "but only
take such as I may leave," the meaning of which is in dispute,
I conclude, that by the other portions of the clause, the testa-
tor clearly shows that he intended, so far as the stocks are con-
cerned, to give a specified portion of particular stocks owned by
him at the date of the will, and that the legacies of the stock
were specific and not general legacies.

The next question as to the legacies in stocks is whether, under
the last paragraph of the "further meaning" clause, the executor
can take stocks which testator left at his decease, other than
those specified, to supply the stocks specified, which were not left
at his decease.   It is not claimed that, by the direction to take
"such as I may leave," the testator intended to give to the trustee
all the stocks and bonds of any kind which he left, and it is clear
that any "taking" by the trustee under this clause of other bonds
and stocks than those specified cannot, at the utmost, go further
than a taking by way of substitution for the original bequest,
and cannot be enlarged by giving to the trustee whatever bonds

and stocks were left by testator in case any of the bonds and stocks specified were not left.   The dispute over the construction of this clause, both as to the legacies of stocks and the legacies of money in bonds, comes down, therefore, finally to this: Did the testator mean, "if I should not leave all of the bonds or stocks mentioned in the trusts the executor shall not supply said bonds and stocks [not left] but only take such [of said] bonds and stocks as I may leave;" or did he mean, "if I should not leave all of the said bonds or stocks mentioned in the trusts the executor shall not supply said bonds and stocks [not left] but only take [in place thereof] such [other] bonds and stocks as I may leave," or "take such [other bonds and stocks] as I leave."

I think the testator, throughout this "further meaning" clause, was referring to the stocks specially mentioned in the trust bequests, and to them only, and that, having in mind the contingency that he might not leave all the "bonds and stocks mentioned," he expressly directed that the executor should not be required to supply *said* stocks, *i. e.,* those of the *bonds and stocks mentioned* which were not left at his decease, *but,* in the event of his not leaving all of the bonds and stocks mentioned, the executor should *only* take such *of the bonds and stocks mentioned* as were left.   I think, also, that by using the words "but only take" the testator shows an intention to reduce rather than to enlarge the original gifts to the trustee.

If this be the true construction of the clause, then, whether the legacies of stocks are specific or general, the legacies in stocks cannot take effect.   If specific, they have been adeemed and their liability to ademption was intended and expressly provided for by the testator; if general, the direction that the executor shall not purchase or supply the stock forbids the treatment of the legacies as the gifts of money. The reason for construing a general legacy of stock (without more) to be a legacy of money or of money's worth is that, in order to give effect to the legacy and confer the benefit presumed to be intended by the testator, courts construe such general legacy as equivalent to a direction to purchase the stock.   Therefore, and as the result of that construction put on the terms of the gifts, the legatee, having the

right to have as much money laid out in the purchase of stock, is considered to be entitled to the money. But the testator may indicate, as he has in this case expressly indicated, that the legatee is not to have the right to have the stock purchased, and if this right is taken away the right to have the money, which would purchase the stock, cannot be said to exist.

In the *second* place, if my construction of this "further meaning" clause be wrong and the phrase "but only take such as I may leave" means "take whatever stocks I leave," or "take such [other] stocks as I may leave,". this bequest of "other" stocks must fail for uncertainty. No value was fixed by testator's will upon the stocks bequeathed, neither was there any reference in these legacies of stock as to the sum intended to be bequeathed in stocks. There is wanting, therefore, in testator's will any basis or standard from which the court could distribute the stocks he left for the purpose of supplying the stocks specially mentioned, which he did not leave. The court should not undertake to supply the stocks on any standard or basis of its own without being satisfied that there is an express and clear direction to the executor that he must supply the missing stocks from the other stocks left by testator. The "further meaning" clause is susceptible of a plain construction which, when taken in connection with the residuary clause, will provide for the distribution of all of the testator's bonds and stocks according to explicit and particular directions by testator himself, and a construction of this clause which would leave the disposition of a large portion of his stocks, other than those specified in the trusts, to the executor or the courts should not rest on any uncertain or doubtful basis.

The legacies of sums of money "in bonds" occur in separate clauses from the legacies of stocks; they are made in different terms, and although "bonds and stocks" are mentioned together in the clauses giving directions to the executor and also in the "further meaning" clause, this association of them does not make the legacies so far of the same character that, if the legacies of the stock are held to be either specific or general, the legacies in bonds must also be considered to be specific or general. If these legacies were simply gifts of specified sums of money "in bonds" of a kind or kinds specified, without more, and these

bonds were of such a character as are ordinarily purchasable in the market, the legacies, according to the authorities, would be general legacies. If these legacies are general legacies, then the "further meaning" clause would have the effect of destroying such general legacy, for the same reasons above stated, as to the general legacies of stocks. But the bonds referred to in these legacies are bonds of the kind specified, then owned by the testator. This appears not only from the "further meaning" clause which, as I have above stated, applies to the bonds as well as the stocks, but from a clause in the very gifts of the legacy: The gifts are of money in bonds, "to be taken at their face value." This limitation excludes the idea that testator's intention might be that the bonds were to be purchased by the executor from others, and shows the gifts were to be bonds taken by his executor as part of the estate received by him from testator. The testator, in giving a money legacy of specified amount in bonds at par value, could not have intended the amount of money specified to be used in the purchase by the executor of bonds owned by another at the par value of these bonds, irrespective of their actual value, or that an amount of money, equal to the par value of the bonds, should be used to purchase the bonds at their actual value, but must have intended that his own bonds should be specifically taken at a valuation which he fixed for the purpose of his will. If these legacies, therefore, are gifts of specified sums of money in bonds, which were referred to as then owned by testator, the question which arises as to them is whether they are specific or demonstrative.

The name and the legal concept of "demonstrative legacies" came from the civil law, and the illustration from this law of a legacy of this kind is given by Chancellor Kent in *Walton* v. *Walton, 7 Johns. Ch. 262:* "We have an example of this kind of money legacy given in the civil law and of the sound principle upon which the distinction is supported. The testator gave to *Pamphila* four hundred aurei, or pieces of gold, and referred to a debt which *Julius,* his agent, owed him, and to his property in the army, and to his cash. (*Aureos quadringentos Pamphilae dari volo, ita ut infra scriptum est; ab Julio auctorie aureos tot; et in centris quos habeo, tot; et innumerato quos*

*habeo tol.*) He died without altering his will, but after he had converted all that property to other uses, and the question was whether the legacy was due. The answer of Julian, the civilian, was that the testator intended only to point out to his heirs the funds from which the legacy could be most easily drawn without intending to annex a condition to a pure gift, and that the legacy was consequently to be paid." After stating that the English decisions up to that date turn on very refined distinctions, Chancellor Kent gives the following result of his careful analysis of the authorities in cases of this character. *Ib. 264.* "The reasoning on this subject is, that if the legacy is meant to consist of the security, it is specific, though the testator begins by giving the sum due upon it. A legacy of a debt, unless there is ground for considering it a legacy of money and that the security is referred to as the best mode of paying it, is as much specific as the legacy of a horse or any movable chattel whatever. If the specific thing is disposed of or extinguished the legacy is gone. * * * It is essentially a question of intention, when we are inquiring into the character of a legacy upon the distinction taken in the civil law between a demonstrative legacy, where the testator gives a general legacy but points out the fund to satisfy it, and where he bequeaths a specific debt."

To arrive at the testator's intention to make the legacy specific or demonstrative the whole will must be considered, and the question is whether upon the whole will it appears that the bonds or securities are intended merely as the primary source for the payment of a legacy in money, which is to be paid at all events, or whether the bonds or securities specified are the things which are intended to be given and are the only source for the payment of the legacy. If the former, the legacy is demonstrative, and on failure of the primary source of payment the legacy, as one of money, is payable from the general estate; if the latter, the legacy is a specific legacy of the bonds or securities, not of the money in them or secured by them; and if the specific security bequeathed is disposed of or extinguished, the rule of ademption applies and the legacy is gone. *3 Pom. Eq. Jur. § 1133.* This effect of holding a legacy to be specific inclines courts, in all cases depending upon this character of the

legacy, to consider legacies opening with the bequest of sums of money to be general or demonstrative rather than specific, and a clear intention must appear in order to make a legacy specific. *Norris* v. *Thomson, 1 C. E. Gr. 218, 223; S. C. on appeal, 1 C. E. Gr. 542, 545; Johnson* v. *Conover, 9 Dick. Ch. Rep. 333, 340 (Vice-Chancellor Reed, 1896)*; affirmed on appeal for reasons stated, *10 Dick. Ch. Rep. 592.* This inclination of the courts arises from the presumption that the testator intended a real benefit to the legatees, and in order to carry this intention into effect and protect legacies from the operation of a fixed and inflexible rule of ademption, which applies to specific legacies, the application of which rule the testator had apparently not foreseen or provided, courts are disposed to consider the legacies general or demonstrative, if the language of the will admits of such construction. In the present case, the fact that the testator, as grandfather, stood in *loco parentis* and was giving portions to the grandchildren and their issue, some of it for the education and support of infants, makes this rule of construction of the will specially applicable, so far as the case depends upon deciding the legacies to have been originally specific. But on the other hand, this inclination of the courts never extends so far as to give a strained or unreasonable construction, and in the present case is subject to the special and exceptional control of the "further meaning" clause, which shows that the testator had expressly in mind the contingency or fact upon which the rule of ademption comes into operation, and gave directions apparently to meet that state of facts. Cases like the present are always cases of construction of the special will in question, on consideration of its entire provisions, and beyond the application of the general rule that courts incline to consider the legacies general or demonstrative, so far as decision rests on its application alone, little assistance is to be obtained from an examination of the cases in detail and an attempt to follow or reconcile the refined distinctions sometimes made. In the following cases our own courts, applying the distinction above stated by Chancellor Kent and the rule inclining against specific legacies, have held legacies to be general or demonstrative rather than specific. In *Blundell* v. *Pope, 21 Atl. Rep. 456 (Vice-*

*Chancellor Pitney, 1890*), a bequest to testator's wife of "bonds and mortgages or other securities of the value of twenty thousand dollars," and others of like character were held to be general. In *Langstroth* v. *Golding, 14 Stew. Eq. 49* (*Chancellor Runyon, 1886*), testator directed:

> "Having $2,000 out at interest at seven per cent., it is my will that the said sum shall be kept invested by my executor till my granddaughter, E. N. J., shall arrive at the age of twenty-one years, when I direct that the said sum of $2,000 shall be equally divided between her and her husband," &c.

. The testator had $2,400 thus invested. The legacy was held not to be specific, but general. In *Johnson* v. *Conover, supra,* the bequest was: "I give and bequeath unto my beloved wife, Margaret, the sum of eight thousand dollars, invested in stocks, the interest whereof to be paid to her during life," and the legacy was held to be demonstrative.

In considering the question whether these legacies "in bonds" are specific or demonstrative, it is assumed that, in specifying the bonds in the trust bequests, the testator is referring to bonds then owned by him and part of his estate. For the reasons given, in considering the legacies of stock, I consider that the testator, in these legacies of money in bonds, also referred to the bonds existing in his estate. If he did not refer to existing securities owned by him, then the legacies in bonds are not demonstrative but must be either specific or general. In either case they fail, for the reasons that the legacies of stock fail. But the whole case of the defendants, as to the bonds, is rested on the claim that the legacies in bonds are demonstrative, *i. e.,* that they are legacies of sums of money, primarily payable from designated securities pointed out by the testator, and part of his estate, and that, these sources failing, they are payable either generally as money legacies or in the manner specially pointed out in the "further meaning" clause, as a second demonstration of the source of payment of the legacy of money "in bonds" of the testator in his estate at his death. Assuming, then, the legacies to be legacies of separate specified sums of money, in bonds of a specified kind,

Blair *v.* Scribner.

then owned by the testator, to be taken at their par value, the question is whether the testator intended to give separate sums of money, pointing out or demonstrating for each sum certain bonds which he then owned as a source of payment of the sum of money specified, but not the only source, or whether the testator intended to give separate specific legacies of bonds then owned by him, fixing the amount in money of each separate gift of bonds at the par value of the bonds. If he intended the former, the legacy is demonstrative; if the latter, it is specific. I think the latter construction to be clearly the meaning of the testator, and that effect cannot be given to the limitation of the legacy "in bonds" made by the clause "to be taken at their par value," unless the gifts were specific gifts of the bonds. This limitation of the gift shows clearly, I think, that the testator did not intend to give at all events and unconditionally the money amount of the legacy, but intended the legacy to be of particular bonds owned by him, of a certain face value of money, which showed the number or amount of bonds given. This estimation by the testator of the value of his bonds or securities in money, for the purpose of fixing the amount of the legacy, is considered as an indication that the legacy is not demonstrative or general, but specific. *18 Am. & Eng. Encycl. (2d ed.) 719.* In the present case one reason appears for the estimation of the trust bond bequests in money, and it is that the intention of the testator, by the bond bequests, was to equalize the grandchildren's bequests by deducting from the amount given each share or portion ($200,000 in five trusts and $206,000 in J. Blair Scribner's) the amount already advanced, or intended to be advanced by the will, in cash, by the testator to each grandchild. The whole series of trust bequests in bonds and cash shows that the grandchildren and their children are made substantially equal and that for this purpose bonds at par are considered as cash. But the reference to the par value of the bonds was, as I think, mainly, if not altogether, for the purpose of indicating what number or amounts in each specified kind of bonds were to be taken.

Other portions of the will, outside of the clause making the gifts of the legacies, show that bonds to an amount fixed by

their par value were specifically given to the trustee, and not sums of money equal to the face value of specified ·bonds owned by the testator. In three of the trusts, the Arthur· Scribner, Isabella Scribner and Clarence Mitchell, the first trust, upon which the legacies are given, is to deliver to each of these beneficiaries, on arriving at ·the age of twenty-one, "fifty thousand dollars in any of the bonds above specified which the said Arthur may choose to take, said bonds to be taken at their face value," &c. If the legatee prefers to have the money, "then the trustee shall sell and dispose of fifty thousand dollars of the most valuable of the said bonds in this item specified and pay the proceeds of such sale" to the legatee. This shows that the specified bonds, and not money to the amount of the bonds, are intended to be taken by the trustee, and that the bonds are to be delivered by him for subsequent delivery to the legatee, or sale, at the option of the latter.

A gift or trust to sell or otherwise deal with bonds or securities is often held to indicate that the legacy is specific. *Theob. Wills (4th ed.) 113; Ashton v. Ashton, 3 P. Wms. 384.*

The further provisions in each of these trusts, that if the legatees prefer money, the trustee shall sell and dispose of $50,000 of the most valuable bonds mentioned in the item to raise the money, and the fact that no other provision for the payment of this money is made than a sale of a portion of the bonds specified, show that, as to this portion of these three trusts, the bonds are the only source for the payment of the money, and to this extent the legacy cannot be demonstrative but must be specific. Some cases hold that where the security is the sole source of payment the legacy is specific. If, for the purposes of the trusts upon which these three legacies are given, or any part of these trusts, the testator has clearly indicated that the trustee is intended to take bonds only and not money to the amount of the bonds, it will be difficult·not to conclude that all the trust legacies in question were not specific legacies of bonds. The fact that one gift is specific or demonstrative is sometimes taken as an indication that others are of the same character. And in this case the general· similarity, I may say identity of plan and purpose, of all the trust bequests (so far as the feature now in question

is concerned) must give any special indication of testator made in anyone of the trusts weight in considering the character of the others.

The next indication that the gifts were specific is found in the opening portion of the "further meaning" clause. The testator, in beginning this clause and referring to his trust bequests, uses words which, on the face of them, declare that the bonds were given to the executor. The language is: "If I should not leave at my decease all of the bonds or stocks mentioned in my said will and given to my son as trustee." This reference to the *bonds* as having been given is not, and should not be, considered as decisive upon the question now being considered, because it cannot be said that it sufficiently appears from the clause itself that the testator's intention was specially directed, in framing it, to the gifts as being legacies of money "in bonds" and not simply gifts of bonds, as his language would imply. But the words used by the testator in describing the gifts are entitled to proper consideration in connection with the terms of the gifts themselves and the testator's directions as to the disposition of the property given. And if these show that the gifts are clearly, or may fairly be considered specific gifts of bonds, the testator's own language, describing his gifts as gifts of bonds and not as gifts of money, must have weight in deciding whether his primary intention was to give bonds or to give legacies of money. The provisions of the will to which I have referred indicate, and indicate clearly, as I think, that the original gifts as legacies in bonds were specific and not demonstrative.

I next come to the question of the effect of the "further meaning" clause upon the trust legacies "in bonds." If the legacies "in bonds" as well as the legacies of stock are either specific or general, then the effect upon them of the ademption of the legacies and of this clause is the same as in the case of the legacies of stock. As these legacies are, in my judgment, specific, they fail to the extent that the bonds specified were not left by the testator. But if it be held (1) that the bequests are demonstrative, and it be also held (2) that under this clause the executor, in order to supply the missing bonds, is to take

Blair *v.* Scribner.

"whatever" or "such other" bonds as testator may leave, then the consideration as to the uncertainty which invalidated or made ineffective the bequests of stocks will not apply to the legacies "in bonds." These begin as legacies of amounts of money, and if the reference to the bonds be held to be matter of demonstration or description only, and, under the "further meaning" clause, whatever bonds testator leaves are to be taken for the amount of legacies in the missing bonds, and the amount of the legacy in money, or payable in the missing bonds, is to be paid from the other bonds left by testator at his decease, then bonds of the value of the legacy in money can be selected by the executor, subject, if necessary, to appeal to the court by either party. Several other bases for "taking" bonds for these legacies of money in bonds were suggested by the answer, or at the hearing, but in the absence of any express and clear direction by testator this is, I think, the only possible method under testator's will for paying these legacies, if they are held to be demonstrative.

Evidence was taken in reference to the circumstances of the testator's acquisition of the bonds and stocks, or some of them, and also as to his disposition of them, and some evidence also bearing, or claimed to bear, upon his habits and methods of business. So far as this evidence relates to the situation of the testator's estate at the time of the will, or to the disposition subsequently of property referred to in the will, this evidence is admissible and material for the purpose of applying the terms of the will. But the evidence as to his method of business, especially in relation to the acquisition and disposition of securities of the character referred to in the will, was to some extent relied on or urged as showing his intention in these bequests and thus throwing light on the construction of his will. I have not considered the evidence, deeming it, in this aspect, clearly inadmissible for this purpose. Wills are required to be writing duly authenticated, and courts must construe the words used in the written will, using the same methods and rules of construction of the written document for all testators alike. To allow the special methods of business or habits of one testator (established by parol evidence) to give to the words of his

will a construction different from that which would be given to the wills of other testators using the same words would, to that extent, subject wills to the perils of parol evidence, which the statute and the general policy of our laws wisely excludes.

Upon the principal question presented and argued I conclude that the direction of the court should be that the trustee, for the purposes of the several trusts included in these "items" of the will, called the "Grandchildren's Trusts," is to take only such of the bonds and stocks, specified in the several trusts, as were left by the testator, and is not to supply bonds or stocks specified in the trusts, not left by the testator, from other bonds or stocks left by him, nor is he to pay in money from the estate the amount of the legacies "in bonds" which were not left in the estate. If there is any dispute as to whether any particular bonds or stocks left by the testator are to be taken as the particular bonds or stocks specified in the trust bequests, I will hear counsel further on this point. A memorandum will be filed later as to the other questions which have been submitted, but in the matter of the John D. Vail legacy I will postpone decision, pending application to take further evidence, which is referred to in the briefs of his counsel.

Pursuant to the leave reserved in my opinion a further hearing has taken place before me upon the question whether the bonds of the Fremont, Elkhorn and Missouri Valley Railroad Company, referred to in the bill and held by the testator at the time of his death, pass to the trustee (to the amount of $100,000) under the several bequests of bonds of that description. The bonds of this company, held by the testator at the date of the will, were all subsequently surrendered by the testator to the company and in place thereof the bonds, held at the time of his death, were given, together with some subsequently disposed of in his lifetime. There was no reorganization of the company leading to this exchange. The identity required in these cases, in order to pass by a specific bequest, is a substantial identity, and a change which leaves the thing, to all intents and purposes, as it was before, does not effect ademption. The leading case is *Oakes* v. *Oakes, 9 Hare 666*

(*Vice-Chancellor Turner, 1852*). In this case there was a bequest of "all my Great Western shares and all the other railway shares which I shall be possessed of at the time of my decease." Testator, at the date of the will, held £7,000 in shares of the Great Western Railroad Company. Subsequently, under authority of an act of parliament, these shares were converted into consolidated stock of the same company. It was said (at *p. 672*) that "the question is whether a testator has at the time of his death the same thing existing, it may be in a different shape, yet substantially the same thing," and the consolidated stock was held to pass by the bequest. The rule laid down in this case has been followed without question. *Theob. Wills (4th ed.) 128.*

I conclude that the bonds of this description left by the testator at his death, received in exchange for those held by him at the date of the will, pass by the bequest to the trustee. By reason of this conclusion the amount left in the trusts is increased over the amount stated in my opinion.